IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Case No. TJS-20-1078 |
| LOVELL PATTERSON | * | |

\* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Pending before the Court is the "Petition for the Issuance of Subpoenas Pursuant to Rule 17(b) and (c) of the Federal Rules of Criminal Procedure" ("Petition") (ECF No. 19) filed by Defendant Lovell Patterson ("Mr. Patterson").[1] In the Petition, Mr. Patterson requests that the Court "order the issuance of [proposed] subpoenas for documents, testimony, and an inspection of Chesapeake Detention Facility (CDF) pursuant to Federal Rules of Criminal Procedure 17(b) and (c)." (*Id.* at 1.) Mr. Patterson contends that the information sought through the subpoenas is "necessary and essential" for his upcoming detention hearing. (*Id.*) Having considered the submissions of the parties (ECF Nos. 19, 26, 27 & 28), the Court concludes that no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the Petition will be granted in part and denied in part.

**I.     Procedural History**

Mr. Patterson is charged in a criminal complaint with conspiracy to distribute and possess with intent to distribute 40 grams or more of a mixture or substance containing a detectable amount of fentanyl and a mixture or substance containing a detectable amount of cocaine in violation of

---

[1] It appears that Mr. Patterson's first name was misspelled in the criminal complaint.

21 U.S.C. § 846. (ECF No. 1.) The undersigned approved the criminal complaint and issued an arrest warrant for Mr. Patterson on April 14, 2020. (ECF No. 2.)

On April 16, 2020, Mr. Patterson had his initial appearance in this Court. (ECF No. 5.) He consented to detention and Chief Magistrate Judge Beth P. Gesner entered an Order of Detention by Agreement. (ECF No. 10.) On April 23, 2020, Mr. Patterson filed a written request that a detention hearing be scheduled, stating that he had a "proposed release plan to present to the Court that . . . addresses any concern about risk of flight or danger to the community." (ECF No. 16.) A detention hearing was scheduled before Magistrate Judge A. David Copperthite for May 6, 2020. On April 27, 2020, the Petition was filed. (ECF No. 19). Mr. Patterson filed the Petition under seal but provided a copy to the government. On April 28, 2020, the parties were notified that the undersigned will preside over Mr. Patterson's detention hearing. (ECF No. 20.)

An on-the-record telephone conference was held with defense and government counsel on April 29, 2020. (ECF No. 22.) During the conference, defense counsel advised that the information sought in the subpoenas was necessary for the detention hearing. Defense counsel agreed to a brief continuance of the detention hearing to allow for the Court to rule on the Petition. An expedited briefing order was entered and the Petition is now ripe for the Court's consideration.[2] (ECF No. 23.)

## II.   Relevant History for Consideration of the Petition

Mr. Patterson asks, pursuant to Fed. R. Crim. P. 17, that the Court issue subpoenas for documents, testimony, and for the inspection of the Chesapeake Detention Facility ("CDF") in Baltimore, Maryland, where he is currently detained.

---

[2] On April 30, 2020, Mr. Patterson filed a Motion to Appoint Amicus Curiae (ECF No. 24) but it is not yet ripe for the Court's consideration.

CDF is a detention facility operated by the State of Maryland's Department of Public Safety and Correctional Services ("DPSCS"). Previously, CDF was named the Maryland Correctional Adjustment Center ("MCAC") but it was commonly referred to as "Supermax." Generally speaking, Supermax was the DPSCS facility that housed three types of inmates: state inmates sentenced to the death penalty, state inmates considered to be the most violent or dangerous, and state inmates with the most significant disciplinary issues. All prisoners at Supermax were held in near isolation and segregation in a building designed by DPSCS for that specific purpose. In September 2010, the United States Department of Justice, Office of the Federal Detention Trustee, entered into a contract with the State of Maryland to lease the entire Supermax facility to house a total of 500 adult federal detainees (478 male and 22 female). DPSCS provides all services including security, safety, medical services, housing, food services and sanitation. Unless renewed, the agreement terminates on August 30, 2025. Sometime in 2011, DPSCS re-branded Supermax and named it the Chesapeake Detention Facility. Despite the name change, the facility is the same building that was designed to house maximum security inmates. The only significant change is that the facility now houses only federal detainees. These federal detainees are mostly awaiting trial, although some are awaiting sentencing or violation hearings, and others are awaiting designation to the Bureau of Prisons or transfer to another district.

Not all of the District of Maryland's federal detainees are held at CDF. For several reasons, including the geographic composition of the divisions that comprise the District of Maryland, the particular needs of certain cases, and other issues at CDF, many detainees are housed at the Correctional Treatment Facility ("CTF"). CTF is part of the District of Columbia Jail ("D.C. Jail") and is operated by the District of Columbia Department of Corrections ("D.C. DOC").

Even before Mr. Patterson's arrest, COVID-19 had been steadily spreading throughout the

region, impacting virtually every aspect of public life. The spread of COVID-19 in the District of Maryland's pretrial detention facilities remains a significant concern. The virus is highly contagious and the disease is highly fatal. *See United States v. Lee*, No. ELH-19-0159, 2020 WL 1974881, at *6 (D. Md. Apr. 24, 2020). As Judge Hollander recently noted, correctional facilities "are in general ill-suited to prevent outbreaks and mitigate their spread." *Id.* at 7. At D.C. Jail and CTF, as of May 6, 2020, the D.C. government reported that there are 158 detainees who have tested positive (43 in isolation and 110 recovered); 811 detainees who are currently under quarantine; and one pretrial detainee who has died from COVID-19. *See Public Safety Agency COVID-19 Case Data*, Gov't of D.C., https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data (last visited May 7, 2020). So far, CDF has not experienced the rates of infection that exist in the D.C. Jail and CTF. As of May 4, 2020, DPSCS reported two total cases of COVID-19 infection at CDF, including one officer and no inmates.[3] *See COVID-19 Updates,* Maryland Department of Public Safety and Correctional Services, https://news.maryland.gov/dpscs/covid-19/ (last visited May 7, 2020).

The conditions at D.C. Jail and CTF have been carefully considered by another federal court in a civil case and a temporary restraining order has been issued. *See Banks v. Booth*, No. 20-849 (CKK), 2020 WL 1914896, at *11 (D.D.C. Apr. 19, 2020). In that case, the court concluded that there was substantial evidence that the D.C. DOC was aware of the threats posed by COVID-19 but had "disregarded those risks by failing to take comprehensive, timely, and proper steps to

---

[3] The Court cannot explain the apparent discrepancy in the number of COVID-19 cases at CDF reported by DPSCS. In any event, Mr. Patterson submitted a letter to the Court on May 6, 2020, advising that an inmate who had recently arrived at CDF had tested positive for COVID-19. (ECF No. 28.) Mr. Patterson's attorneys state that they are also aware that a "Sergeant from CDF tested positive yesterday, meaning we are now aware of two correctional officers, a staff member, and an inmate who have tested positive." (*Id.*)

stem the spread of the virus," in violation of the detainees' due process rights. The *Banks* court also ordered the D.C. DOC to take additional steps in regard to the COVID-19 pandemic. The ruling and the briefs submitted in that case highlight the tremendous pressure the D.C. DOC is under to respond to COVID-19 inside the D.C. Jail and CTF.

The *Banks* decision also had other implications. Since the beginning of the COVID-19 pandemic, some defendants have sought to be released from detention because of the risk that COVID-19 poses to them as detainees. Many of those defendants who filed motions for release were detained at the D.C. Jail and CTF. In response to nearly every motion that was filed, the government told the Court that the D.C. DOC had established comprehensive procedures to avoid a COVID-19 outbreak. As the *Banks* court discovered, this turned out not to be the case. *See United States v. Demetrius Keaton*, No. TDC-18-215 (D. Md. Apr. 23, 2020), ECF No. 84.

To date, the Court is not aware of any information indicating that CDF's response to the COVID-19 pandemic has been inadequate (other than the evidence that Mr. Patterson proffers in the briefing related to the Petition). But there is today a "unique threat posed by the COVID-19 pandemic, the worst the world has experienced since 1918." *Lee*, 2020 WL 1974881, at *11. And given the threat that COVID-19 presents to individuals detained in the tight confines of correctional facilities, particularly one that was designed to house maximum security inmates, Mr. Patterson's Petition warrants serious consideration. If he can present information at his detention hearing that CDF is not adequately responding to the COVID-19 pandemic, he will have a stronger argument that the Bail Reform Act requires him to be released on conditions.

**III.    Analysis**

At Mr. Patterson's detention hearing, the Court will consider the factors set forth in 18 U.S.C. § 3142(g) to determine whether he should be released or detained pending trial.[4] These familiar factors include the seriousness of the offense, the strength of the government's evidence, the history and characteristics of the defendant (including his "physical and mental condition"), and the nature of the danger to the community if the defendant is released. Mr. Patterson states that "he suffers from high blood pressure for which he takes three separate medications." (ECF No. 19 at 2.) This is a personal characteristic that the Court must consider. Before the COVID-19 pandemic, information about Mr. Patterson's hypertension condition would have barely factored into the Court's analysis. This information, by itself, does nothing to cast light on whether Mr. Patterson is or is not a flight risk or a danger to the community. Moreover, CDF is capable of managing the health of inmates with hypertension.

However, under the dark cloud of the COVID-19 pandemic, this information could have a material bearing on the Court's analysis. There is ample evidence that people with hypertension are more likely to experience complications if they become infected with COVID-19. *See United States v. Dunlap*, No. 02-165-1, 2020 WL 2062311, at *2 (M.D.N.C. Apr. 29, 2020) (noting that hypertension "has been identified as a common, significant comorbidity of COVID-19" and citing medical evidence); *see also Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133, at *1 (D. Md. Apr. 3, 2020) ("Of those who have died from COVID-19 in Italy, another country experiencing a high number of COVID-19 cases, about three-fourths had high blood pressure, one-

---

[4] Because Mr. Patterson was on supervised release at the time of his alleged criminal conduct in this case, 18 U.S.C. § 3143(a)(1) governs whether he can be released pending trial. Fed. R. Crim. P. 32.1(a)(6). Nonetheless, as Mr. Patterson correctly notes, the Court will still be required to consider the § 3142(g) factors. (*See* ECF No. 19 at 10 n.8.)

6

third had diabetes, and one-third had heart disease."). If Mr. Patterson's medical condition makes him more likely to experience complications from COVID-19, and if (as he argues) his detention might put him at greater risk of contracting the virus, this will weigh in favor of his release. But as other courts have recognized, "the current COVID-19 pandemic is a poor fit for the § 3142(g) analysis." *United States v. Otunyo*, No. 18-251 (BAH), 2020 WL 2065041, at *8 (D.D.C. Apr. 28, 2020) (citing *United States v. Sagastume-Galicia*, No. 20-40 (BAH), 2020 WL 1935555, at *5 (D.D.C. Apr. 22, 2020) ("[T]he threat of a pandemic does not fit neatly into one of the factors courts must consider under section 3142(g) . . . .")); *Lee*, 2020 WL 1541049, at *4 ("[T]his Court doubts that the COVID-19 pandemic has *any* material impact on the section 3142(g) factors that led [the magistrate judge] to determine that pretrial detention was warranted in [the defendant's] case." (emphasis in original)).

Some courts have concluded that "the more natural mechanism for raising defendant's concerns [regarding the COVID-19 pandemic] is [18 U.S.C.] § 3142(i)." *Otunyo*, 2020 WL 2065041, at *8. In the context of the COVID-19 pandemic, the Fourth Circuit has suggested that § 3142(i) requires evaluating the "severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a 'compelling reason' for temporary release under 18 U.S.C. § 3142(i)." *United States v. Creek*, No. CCB-19-0036, App. No. 20-4251, at *1 (4th Cir. Apr. 15, 2020). In analyzing whether temporary release under § 3142(i) is necessary, courts "must be mindful of the factors set out in 18 U.S.C. § 3142(g)." *United States v. Thorne*, No. 18-389 (BAH), 2020 WL 1984262, at *2 (D.D.C. Apr. 27, 2020); *see also United States v. Creek*, No. CCB-19-36, 2020 WL 2097692, at *3 (D. Md. May 1, 2020) ("[I]n deciding whether temporary release is warranted, the court must

still consider the danger to the community or risk of flight that would be posed by the defendant's release as analyzed under the factors set forth in 18 U.S.C. 3142(g).").

Because of Mr. Patterson's medical condition, information about "the current COVID-19 situation at the facility where he is being held" will be relevant to the Court's inquiry at the detention hearing, regardless of whether it is relevant under the § 3142(g) factors or under § 3142(i), or both. Much of the information that Mr. Patterson requests through his proposed subpoenas is generally relevant because it concerns the "current COVID-19 situation" at CDF. And if this were a civil case where the parties were conducting discovery, the broad relevance standard of Fed. R. Civ. P. 26 would likely allow Mr. Patterson to obtain much of the information he seeks.[5] But this case arises in a different context.

Under Fed. R. Crim. P. 17(c), upon the request of a party, the Court may order that a subpoena be issued that directs a "witness to produce any books, papers, documents, data, or other objects the subpoena designates." But "Rule 17(c) . . . is not a discovery device." *United States v. Fowler*, 932 F.2d 306, 311 (4th Cir. 1991) (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)); *see also United States v. Richardson*, 607 F.3d 357, 368 (4th Cir. 2010) ("[A] fundamental concern is that [a Rule 17(c) subpoena] is not intended to provide a means of pretrial discovery."). A court will "quash or modify [a] subpoena if compliance would be unreasonable or

---

[5] It bears repeating that Mr. Patterson is seeking to conduct wide-ranging discovery using a very limited tool. Even putting the restrictive standard for Rule 17(c) subpoenas to the side, the limited "discovery" allowed under the rule pales in comparison to what is available under the civil discovery rules. Even interrogatories, one of the least costly and most effective tools available under the civil discovery rules, are not available under Fed. R. Crim. P. 17. The Court notes that the discovery conducted in the *Banks* case was done in the context of a civil class action complaint filed on behalf of a class of similarly situated detainees in the custody of the D.C. DOC before an Article III judge with the power to grant injunctive relief. Mr. Patterson cannot replicate the discovery taken in the *Banks* case through a request for Rule 17(c) subpoenas filed in a criminal case pending before a magistrate judge in anticipation of a detention hearing.

oppressive."[6] Fed. R. Crim. P. 17(c)(2). A Rule 17(c) subpoena is "unreasonable or oppressive" unless the party requesting it demonstrates:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Nixon*, 418 U.S. 683, 698-700 (1974) (explaining that Rule 17(c) "was not intended to provide a means of discovery for criminal cases" and that "its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials"); *see also United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) (summarizing the *Nixon* requirements as requiring a showing of "(1) relevancy; (2) admissibility; (3) specificity").

---

[6] Mr. Patterson contends that the government lacks standing to object to his proposed subpoenas because it "has no proprietary interest in the requested documents and it can assert no privilege that would prevent Mr. Patterson from obtaining access to them." (ECF No. 27 at 2 n.1.) The Court disagrees and will consider the government's response for two reasons. First, the Court finds that because the subpoenas have not yet been issued and because Mr. Patterson has not sought to file his Petition *ex parte*, the government has standing to respond as a party to this case. *See United States v. Wittig*, 250 F.R.D. 548, 551 (D. Kan. 2008); *see also United States v. Thompson*, No. PWG-19-604 (D. Md. Apr. 23, 2020), ECF No. 50 (considering the government's opposition to a petition for the issuance of Rule 17 subpoenas where the government did not know the content of the defendant's requests); *United States v. Ging-Hwang Tsoa*, No. 13-137 JCC, 2013 WL 5837631, at *1 (E.D. Va. Oct. 29, 2013) (considering the government's objection to subpoenas requested by the defendant under Rule 17(c) on the grounds that the subpoenas were a "fishing expedition and an impermissible attempt to use Rule 17(c) . . . in a manner akin to civil discovery"). Second, regardless of the government's position, the Court is required to assess whether the proposed subpoenas comply with the requirements of Rule 17(c). To that end, the government's response is useful in assisting the Court in determining whether the proposed subpoenas should be issued, denied, or issued with modification. *See United States v. Bergstein*, No. 16-CR-746 (PKC), 2017 WL 6887596, at *3 (S.D.N.Y. Dec. 28, 2017) (collecting cases where courts have considered motions to quash "irrespective of any determination on standing because of an independent duty of the court to ensure the propriety of Rule 17(c) subpoenas").

The Court will assume that the information sought by Mr. Patterson through his proposed subpoenas is generally relevant, at least for the purposes of his detention hearing. While other courts have set higher thresholds for relevance in the Rule 17(c) context, those rulings were all made in connection with a defendant's preparation for trial. *See, e.g., United States v. Lindberg*, No. 5:19-CR-22-MOC-DSC-1, 2019 WL 7000089, at *3 (W.D.N.C. Dec. 20, 2019) (stating that with regard to relevancy, the "party seeking the subpoena must demonstrate a sufficient likelihood that the requested material is relevant to the offenses charged in the indictment") (internal quotation marks omitted). Here, the information that Mr. Patterson seeks is not relevant to the offense charged in the criminal complaint, but he is seeking it for a different reason. Because the information sought concerns "the current COVID-19 situation" at CDF, it is relevant to the issues that will be raised at his detention hearing. Among those anticipated issues is the extent to which Mr. Patterson's medical condition, combined with the conditions at CDF, weighs in favor of his release given the COVID-19 pandemic.

The inquiry is more complicated with regard to admissibility. Courts construing *Nixon*'s admissibility requirement have held that the party seeking the information must demonstrate that it has "a valid evidentiary use under the Federal Rules of Evidence," *United States v. Al-Amin*, No. 1:12-CR-50, 2013 WL 3865079, at *7 (E.D. Tenn. July 25, 2013) (citing *Nixon*, 418 U.S. at 701), and make "a sufficient preliminary showing that the requested material contains evidence admissible with respect to the offense charged." *United States v. Indivior Inc.*, No. 1:19CR00016, 2020 WL 616167, at *3 (W.D. Va. Feb. 10, 2020). But "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information" at detention hearings under the Bail Reform Act. 18 U.S.C. § 3142(f). Because of the relaxed

10

evidentiary standards at detention hearings, it is not necessary to consider whether the information Mr. Patterson seeks has a "valid evidentiary use" under the Federal Rules of Evidence.

But the Court must still consider whether the information Mr. Patterson seeks is "admissible" in the framework of a detention hearing. In the Court's view, evidence is "admissible" at a detention hearing where it is both reliable and material to the issues raised at the hearing. Judges have broad discretion in conducting detention hearings and managing how evidence is presented. *See United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986) ("Congress explicitly left open what kinds of information would be a sufficient basis for release, choosing to leave the issue to the judgment of the courts on a case-by-case basis."); *United States v. Sanchez*, 457 F. Supp. 2d 90, 92 (D. Mass. 2006) (discussing a judge's discretion with regard to evidence presented at detention hearings). Typically, questions about what evidence is permissible at detention hearing centers on the reliability of the evidence. *See, e.g., United States v. Goba*, 240 F. Supp. 2d 242, 247 (W.D.N.Y. 2003); *United States v. Hammond*, 44 F. Supp. 2d 743, 745 (D. Md. 1999); *United States v. Acevedo-Ramos*, 755 F.2d 203, 208 (1st Cir. 1985); *United States v. Delker*, 757 F.2d 1390, 1397 (3d Cir. 1985). The reliability of the evidence that Mr. Patterson seeks in his proposed subpoenas is not at issue.[7] Instead, the issue is whether the information that Mr. Patterson seeks would be of any assistance on the issue of release or detention. Where information is cumulative of other evidence or immaterial to the decision the Court must make, it is not "admissible" for purposes of Rule 17(c) in the context of a detention hearing.[8]

---

[7] To be clear, the Court anticipates that Mr. Patterson may object to evidentiary proffers made by the government on reliability grounds.

[8] This is a more technical way of saying that the Court will not permit a party to waste time with proffers and evidence that will not aid in the Court's decision.

11

Finally, Mr. Patterson must show that his requests are specific. "Specificity is the most difficult hurdle to overcome." *Wittig*, 250 F.R.D. at 552. Courts routinely deny requests for Rule 17(c) subpoenas where the requests are so nonspecific as to "cast a wide net that betokens a 'general fishing expedition.'" *Caro,* 597 F.3d at 620 (quoting *Nixon*, 418 U.S. at 700); *see also United States v. Crosland*, 821 F. Supp. 1123, 1129 (E.D. Va. 1993) ("The specificity requirement announced in *Nixon* is designed to ensure that the use of trial subpoenas is limited to securing the presence at trial of particular documents or sharply defined categories of documents.").

The Court will now address the three subpoenas requested by Mr. Patterson.

### A.  Subpoena to Produce Documents

Mr. Patterson requests that the Court issue a subpoena directing Stuart Nathan, Assistant Attorney General for DPSCS, to produce the following documents:

> 1. Any and all documents and information regarding how CDF will handle residents or staff who test positive for COVID-19 or are suspected of being positive for COVID-19, including medical treatment, surveillance/monitoring, health and hygiene measures, and housing (including the location and conditions of housing).
>
> 2. Any and all documents, communications, and information issued by the Department of Public Safety and Correctional Services (DPSCS) or Corizon Health regarding COVID-19 preventative measures taken at CDF, including the implementation of social distancing, medical monitoring/surveillance, health and hygiene measures, the use of PPE, the use of cleaning supplies, tools, and products, screening of residents, staff, and visitors, and the quarantining of new residents.
>
> 3. Any and all documentation of audits of COVID-19 preparedness at CDF.
>
> 4. Any and all documents issued by DPSCS and Corizon Health regarding COVID-19 testing of residents or staff.
>
> 5. Any and all documents addressing how residents and staff will be monitored for the presence of COVID-19 symptoms, including the handling of sick call requests, any process for regular temperature checks, or observations by medical staff.

6. Any and all data on the time it takes for residents displaying or reporting COVID-19 symptoms and/or submitting sick calls/requests to be seen by medical staff.

7. Any and all documents addressing the actual or planned medical care for residents exhibiting COVID-19 symptoms issued by DPSCS or Corizon Health, including:

(a) where and how medical care will be provided;

(b) the number of Medical Doctors, Registered Nurses, and other medical professionals on staff at CDF, the hours and days they are on site, and the availability of medical equipment specifically needed for treatment of those who are infected with COVID-19, including ventilators; and

(c) if the Metropolitan Transition Center (MTC) infirmary is to be used, any and all information regarding MTC's capacity for medical and infirmary care, including the number of Medical Doctors, Registered Nurses, and other medical professionals on staff at MTC, the hours and days they are on site, and the availability of medical equipment specifically needed for treatment of those who are infected with COVID-19, including ventilators.

8. Any and all documents regarding sanitation and cleaning protocol during the pandemic at CDF, including instructions given to residents and staff about the use of cleaning products and policies addressing the cleaning of housing units, common areas, and telephones.

9. A copy of CDF's current physical layout and physical designation of inmates to each cell and areas of the facility.

10. Any and all documents regarding facilitating communication between residents and their counsel, whether by telephone or video conference.

(ECF No. 19-5 at 3-5.)

The document requests listed in Mr. Patterson's subpoena do not comply with *Nixon*'s specificity standard. Nine of the requests seek "any and all" documents for the given topics, without any limitation to a custodian, document type, or time period. These sweeping requests could include almost anything, such as email correspondence among employees of DPSCS, draft copies of memoranda, and notes taken by CDF staff during meetings. Because they are so non-specific, compliance with these requests would be burdensome. Mr. Patterson appears to have cast

these requests in the broadest possible way so as to catch all information that he thinks might be relevant at his detention hearing. This is not permissible under Rule 17(c).

Courts routinely reject Rule 17(c) requests for "any and all" documents because such requests fail *Nixon*'s specificity test. *See, e.g. United States v. Lindberg*, No. 5:19-CR-22-MOC-DSC-1, 2019 WL 7000089, at *2 (W.D.N.C. Dec. 20, 2019) (finding that requests for "all records" and "all communications" "represent exactly the kind of expansive, imprecise discovery that falls outside the scope of Rule 17(c)" and collecting cases); *United States v. Hamlin*, No. RWT-15-378, 2016 WL 10880219, at *2 (D. Md. Feb. 8, 2016) ("Defendant's request from the security company for 'any and all records pertaining' to the apartment complex lacks specificity and will not be granted."); *United States v. Wai Lun Ng*, No. 07-24-V, 2007 WL 3046215, at *3 (W.D.N.C. Oct. 16, 2007) (noting that "[o]ther courts have found that 17(c) subpoena requests for "any and all" documents are too broad to meet the test outlined in *Nixon*").

Request No. 9, which seeks a "copy of CDF's current physical layout and physical designation of inmates to each cell and areas of the facility," is also improper. Presumably, Mr. Patterson occupies one cell in one area of CDF. There is no need for him to go on a "fishing expedition" of the "physical layout and physical designation of inmates to each cell and areas of the facility," to say nothing of the serious security concerns raised by this request. The Court notes that Mr. Patterson must by now be familiar with the dimensions of his cell and the general physical layout of the common areas at CDF to which he has access. He can provide this information to his counsel, who can in turn present it to the Court by way of proffer at the detention hearing. Mr. Patterson may also present evidence by way of proffer regarding what he believes is inadequate about CDF's quarantine and isolation protocols. (*See* ECF No. 27 at 6-7.)

Because none of Mr. Patterson's requests meet the specificity standard that courts have

found to apply under *Nixon*, this alone is a basis to deny his request for the subpoena for documents. *See Lindberg*, 2019 WL 7000089, at *2 ("[T]he sheer breadth of the subpoena requests indicates that Defendant is engaging in a 'fishing expedition' which is simply not allowed under Rule 17.")

In addition to failing *Nixon*'s specificity test, Mr. Patterson's subpoena for documents also seeks information that is not "admissible" at his detention hearing. In its response to Mr. Patterson's Petition, the government produced 19 documents totaling 82 pages, including 18 documents from DPSCS.[9] Mr. Patterson does not believe that these documents are adequate. (*See* ECF No. 27 at 1.) The Court has reviewed the documents attached to the government's response, as well as Mr. Patterson's reply to them. The Court finds that, with five exceptions set forth below, the documents provided are sufficient. Combined with the information that is already in his possession, these documents will allow Mr. Patterson to effectively argue that "the current COVID-19 situation" at CDF is a factor that weighs in favor of his release in light of his medical condition.

The documents attached to the government's response provide information on the conditions at CDF during the COVID-19 pandemic, CDF's various policies for responding to COVID-19, and information about CDF's compliance with these policies. Importantly, on April 30, 2020, United States Marshal Johnny Hughes sent a letter to Federal Public Defender James Wyda regarding the conditions at CDF. (ECF No. 26-16.) Mr. Patterson has received a copy of this letter. The letter contains the report of Marvin Bickham, an independent federal monitor employed by the United States Marshals Service's Prisoner Operations Division, who has been

---

[9] During a telephone conference held on April 29, 2020, the Court requested that the government confer with DPSCS in an effort to obtain some or all of the requested documents without the necessity of a subpoena.

assigned to CDF for more than two years. The report documents Mr. Bickham's review of the practices at CDF during the COVID-19 pandemic.

Aside from the five exceptions listed below, any additional information that Mr. Patterson might obtain from DPSCS would be comparable to the information that he already has. The Court will not allow Mr. Patterson to present cumulative evidence at his detention hearing, so any evidence that is equivalent in nature to what is already in his possession will not be admissible. In addition, Mr. Patterson's counsel will be given the necessary latitude to present information about the topics listed in his subpoena for documents by proffer at the detention hearing. From the Court's review of Mr. Patterson's briefs, it appears that his attorneys have already obtained information about CDF's non-compliance with the governing policies from speaking with other clients and from the observations of an investigator.

As noted above, the Court finds that Mr. Patterson is entitled to request the following five documents from DPSCS:

> 1.   The formal written policy or protocol currently in place at Chesapeake Detention Facility ("CDF") that states when inmates will be tested for COVID-19.
>
> 2.   The formal written policy or protocol currently in place at CDF that states how inmates will be monitored or surveilled for COVID-19 symptoms.
>
> 3.   The formal written policy or protocol currently in place at CDF regarding contact tracing (for both inmates and staff).
>
> 4.   The formal written policy or protocol currently in place at CDF that states how visitors to the facility (such as attorneys and their staff, post office workers, or those delivering goods) will be screened for COVID-19 symptoms.
>
> 5.   The protocols that Corizon Health established for addressing COVID-19 in April 2020 and the Clinical Guidelines that Corizon Health issued for addressing and responding to COVID-19 at CDF.

CDF's official policies on COVID-19 testing, monitoring for symptoms, contact tracing, and visitor screening could be relevant in the Court's consideration of "the current COVID-19

situation" at CDF.[10] The Court is unable to locate these policies in the materials attached to the government's response. The "protocols" and "Clinical Guidelines" issued by Corizon Health are referenced in the letter from United States Marshal Johnny Hughes to the Federal Public Defender.[11] (ECF No. 21-16 at 3.) These materials might also illuminate how CDF is responding to the COVID-19 pandemic and similar materials were not attached to the government's response. Otherwise, the Court concludes that the information sought in this subpoena would not be "admissible" at the detention hearing.

The Court will modify Mr. Patterson's subpoena for documents, order that DPSCS produce the responsive documents to defense counsel by May 14, 2020 at 5:00 p.m., and authorize an investigator from the Office of the Federal Public Defender to serve the subpoena pursuant to Rule 17(c).[12]

The Court will also direct the government to relay the contents of the Order accompanying this Memorandum Opinion to the United States Marshals Service and DPSCS to request that the documents be produced without delay. The Court expects that when either party receives the

---

[10] Mr. Patterson's proposed subpoenas do not specifically request the policy at CDF for contact tracing but he does raise the issue in his reply brief. (ECF No. 27 at 3.) Even though Mr. Patterson has not requested this information, the Court believes that if a contact tracing policy exists at CDF it should be provided to him under Rule 17. This is especially true in light of Mr. Patterson's recent correspondence regarding the new confirmed cases of COVID-19 at CDF.

[11] According to Mr. Patterson, Corizon Health provides healthcare services at CDF through its contract with DPSCS.

[12] It is difficult to think of another scenario where the issuance of a Rule 17(c) subpoena for a detention hearing would be appropriate. Ordinarily, all of the information necessary for a court to make a decision on release or detention is in the possession of the government, the defendant, or perhaps the Pretrial Services officer. This is because a court's decision on release or detention largely turns on the personal characteristics of the defendant and the nature of the crime that is charged. But in this case the Court will also consider the "current COVID-19 situation" at CDF, an issue about which the parties have limited knowledge. For this reason, because of the unusual challenges presented by the COVID-19 pandemic, the Court will allow Mr. Patterson to obtain limited information for his detention hearing through a Rule 17(c) subpoena.

requested documents they will be produced to the other party.

### B.  Subpoena for Witness Testimony

Mr. Patterson requests that the Court issue a subpoena directing Robert Green, Secretary of DPSCS, or his designee, to testify at the detention hearing. He requests that the witness be prepared to testify as to the following topics:

1. CDF's COVID-19 response plan.

2. The conditions within CDF, including:
   (a) The number of residents at CDF;
   (b) The number of residents who share a cell;
   (c) The number of double and single cells used at CDF;
   (d) The number of cells available to be used to quarantine and/or isolate residents and the location of those cells;
   (e) The approximate size of the cells at CDF, including cells used to quarantine and/or isolate residents;
   (f) The size of common areas where residents spend time out of their cells;
   (g) The nature and characteristics of the ventilation system in the facility, including in any area designated for quarantine or isolation;
   (h) The number of hours residents spend outside of their cells each day; and
   (i) The number of telephones available per resident.

3. The current inventory of items necessary to address the pandemic, including:
   (a) The current inventory of PPE;
   (b) The current inventory of COVID-19 tests; and
   (c) The current inventory of sanitation supplies.

4. Data regarding the presence of COVID-19 at CDF (whether resident or staff), including the number of COVID-19 tests administered to any person, including residents and staff, who has been detained or present at CDF during the period of March 1, 2020 to the present and the date(s) and result(s) of those tests.

(ECF No. 19 at 5-6.)

The Court will deny Mr. Patterson's request for a subpoena for the testimony of Mr. Green. Many of the topics have no significant bearing on the decision the Court must make regarding Mr.

Patterson's release or detention. In addition, Mr. Patterson has already received a number of documents related to "the current COVID-19 situation" at CDF, and he should receive more in response to the Court's Order on his Petition. Many of the topics listed in the subpoena for the testimony of Mr. Green are covered in those documents. In addition, Mr. Patterson will be permitted to submit evidence by proffer at the detention hearing, including the observations of his counsel's investigator. The testimony of Mr. Green will not be necessary for the Court to consider "the current COVID-19 situation" at CDF. Such testimony would be cumulative of information that can be presented more efficiently through proffer and reference to the documents that contain CDF's official policies and the evaluations of its compliance with those policies.

### C. Subpoena for Site Inspection

Mr. Patterson requests that the Court issue a subpoena directing Mr. Green to

> allow a full and complete inspection of CDF by an expert designed by defense counsel at any unannounced time(s) and day(s) between the date of the subpoena and May 4, 2020. This inspection includes site visit(s) to CDF, interviews with staff and residents, and review of any requested documents. Mr. Green and/or his designees are expected to comply in a timely manner and in all material respects with this inspection.

(ECF No. 19-4 at 1-2.)

The Court will deny Mr. Patterson's request for a subpoena directing DPSCS to allow a site inspection. First, Rule 17(c) does not permit a party to seek a subpoena for a site inspection as Mr. Patterson proposes. Subpoenas issued under Rule 17(c) are limited to ordering the production of "books, papers, documents, data, or other objects the subpoena designates." Fed R. Crim. P. 17(c)(1). The Court grants that CDF is an "object" in the sense that it is a material thing that can be seen and touched.[13] But CDF is not an object that can be "produced" to Mr. Patterson. And the

---

[13] The Court disagrees with Mr. Patterson that CDF is an "object" in the sense that it is a "person or thing to which thought, feeling, or action is directed." (ECF No. 19 at 8.)

rule does not allow for a site inspection the way that Fed. R. Crim. P. 16(a)(1)(E), Fed. R. Civ. P. 34(a)(2), or Fed. R. Civ. P. 45(a)(1)(A) do. The Court is not persuaded by Mr. Patterson's argument regarding the legislative history of Rule 17 or those rules that were apparently modeled after it. In the Court's view, Mr. Patterson's interpretation of Rule 17 in this context borders on the preposterous. Accordingly, because Rule 17 does not provide that a subpoena may permit the inspection of a building or premises, the Court will deny Mr. Patterson's request for the subpoena directing a site inspection of CDF.

**IV.   CONCLUSION**

For the reasons set forth above, Mr. Patterson's Petition for the Issuance of Subpoenas Pursuant to Rule 17(b) and (c) of the Federal Rules of Criminal Procedure (ECF No. 19) is **GRANTED IN PART** and **DENIED IN PART**. The Petition is granted inasmuch as the Court will modify the subpoena for documents to direct that the Department of Public Safety and Correctional Services produce five categories of documents to Mr. Patterson. The Petition is denied in all other respects. An Order implementing this Memorandum Opinion will follow.

May 7, 2020  
Date

/s/  
Timothy J. Sullivan  
United States Magistrate Judge